TATE, Judge
(concurring in denial of rehearing).
The writer signed the majority opinion with some reservations. He retains them in signing this denial of the defendant-appellant’s application for rehearing.
I am very frank to say that, on the face of the cold record, I believe the defendant, Miss Ball, by the great preponderance of the evidence has proved her defense that the plaintiff’s credit manager agreed, prior to her purchase, that she could buy the going tire business of Coco & Fuglaar, Inc., without being liable for the debt due by this firm to the plaintiff. If so, of course, the plaintiff is estopped from subsequently seeking to hold Miss Ball liable for her failure to comply with the Bulk Sales Act. See, e. g., Chelsea Sales Corp. v. A. Jacobs Co., La.App. 1 Cir., 193 So. 402.
This defense is advanced by the clear and positive testimony of the plaintiff herself and of her witness Jesse Coco, who was with her in the day-long conference with the plaintiff’s credit manager, as well as by the less precise but nevertheless corroborative testimony of Richard Coco, who participated in part of the conference. It is further stipulated that the testimony of two other witnesses is to the same effect.
Further, I think that her version of the incident is to some extent corroborated by other circumstances.
For instance, the plaintiff’s credit manager positively denied having made such an agreement. However, his final version of the conference was as follows, Tr. 239: “She intimated on the afternoon of December 13th 1960, that she was giving some consideration to purchasing the business of Coco & Fuglaar, Inc. And at that time she had also mentioned she was trying to negotiate in someways of not assuming certain indebtedness of Coco & Fuglaar, Inc. and that is the time I had approached her and told her that when she did make up her mind to purchase the business of Coco & Fuglaar, whether it was the next day or a month later, that she should comply with the Bulk Sales Act of Louisiana. And that we were not in there to negotiate or relieve the firm of Coco & Fuglaar of any indebtedness.”
Is it really likely that in the face of this warning (if indeed it had been given) that Miss Ball would have gone ahead and purchased the assets of Coco & Fuglaar without complying with the Bulk Sales Act? If indeed the plaintiff’s credit manager had warned her that by so doing she was exposing herself to the present $14,000 claim against her by the plaintiff ?
In view of this admission by the plaintiff’s credit manager that the subject of Miss Ball’s purchase of the business was indeed discussed at the conference, the following circumstances seem to be more corroborative of Miss Ball’s version of the agreements reached at the conference than of that of the plaintiff’s credit manager:
1. A few days after the conference of December 13th, Miss Ball purchased the *208 business of Coco & Fuglaar. In doing so, she actually did assume and did pay some twenty thousand dollars in outstanding obligations of the firm (see Tr. 180), plus some two thousand dollars to Coco & Fug-laar. She expressly failed to assume only three accounts (one of them being the present) ; with these three creditors, she thought she had an agreement that the account would be paid by Coco & Fuglaar or its owners from other sources or security.
As was pointed out, Miss Ball was familiar with the Bulk Sales Act. If she had not thought that the plaintiff’s account had been by agreement transferred beyond the application of the Bulk Sales Act, she could have protected herself against claims of these and the other creditors of the business by depositing into court the twenty-two thousand-odd dollars consideration for the business which instead she paid directly to the assumed creditors and to Coco & Fuglaar; in this event, the court distributes the consideration pro rata among the creditors, and the purchaser is free from claim by such creditors, LSA-R.S. 9:2963.
2. The plaintiff’s credit manager likewise admitted that he himself was thoroughly familiar with the Bulk Sales Act. He further admitted that, within about a month after the sale, he learned that Miss Ball had purchased the business without having complied with the Act.
Nevertheless, even though the notes given him in settlement of the debt due the plaintiff by Coco & Fuglaar became delinquent at about that time, he never once sought payment from Miss Ball. The first time that the plaintiff made any demand on Miss Ball for payment of the Coco & Fug-laar liability was not until some seven months later.
3. The majority seems to feel that the plaintiff company could have no cause to release any possible purchaser of the Coco & Fuglaar business of a possible liability to pay the debts of the firm, such as the agreement to which Miss Ball testifies.
On the other hand, the evidence reflects that Miss Ball was an excellent businesswoman, and it further reflects that the plaintiff through its salesman and even through its managers in Kansas City persistently attempted to secure Miss Ball’s agreement to handle its products following Miss Ball’s purchase of the business. The plaintiff’s credit manager may well have seen benefit to his company in encouraging a shift to new management by the livewire Miss Ball of the failing tire business being conducted by Coco & Fuglaar at the premises, which was insolvent largely because of the non-payments of accounts due it from its stock holders or their business enterprises.
4.At the conference of December 13th, to secure the payment of the account due by Coco & Fuglaar the plaintiff’s credit manager secured the assignment to the plaintiff of two accounts totaling about twenty thousand dollars in all. (Although these accounts later proved worthless, at the time they were believed to have value.)' The plaintiff’s removal of these accounts from the assets of the firm available to all its creditors, seems to be corroborative that the plaintiff at the December 13th conference agreed to look only to the owners of Coco & Fuglaar for payment, thus intending to waive any rights against Miss Ball on her purchase of the assets of the business; the value of the remaining assets purchased approximately equaled the amount of the firm’s remaining debts assumed by Miss Ball and paid by her as the consideration for the purchase of the business.
I do therefore believe that the version of the agreement given by Miss Ball and her four witnesses, as corroborated by the surrounding circumstances, is more probable than the version given by the plaintiff’s credit manager. However, human beings are not cut from identical patterns, human conduct is unpredictable, and human memories are variable — the trial judge, who saw and heard the witnesses, apparently concluded that the more improbable *209 version of the conference given by the plaintiff’s credit manager was nevertheless the truthful account, expressly negating any such agreement by him as that to which the defendant and her witnesses testified.
Nevertheless, although I myself would reach a different conclusion in the evaluation of the testimony in this record, ultimately I believe the resolution of the central issue of this suit depends on the credibility of the parties at the conference of December 13th, 1960. It is not my function as an appellate judge to reverse the factual determination by the trial court, especially since the evaluation of credibility is within the province of the trier of fact and not within that of the reviewing tribunal, in the absence of positively shown (manifest) error in such regard.
I therefore respectfully concur with the majority opinion on the merits and with the denial of' the rehearing herein.